# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**LEROY DAVIS #560590**                    **CIVIL ACTION NO. 3:13CV2396**
                                           **SEC. P**

**VERSUS**                                 **JUDGE JAMES**

**WARDEN LOUISIANA STATE**                 **MAGISTRATE JUDGE HAYES**
**PENITENTIARY**

### REPORT AND RECOMMENDATION

*Pro se* Petitioner Leroy Davis, an inmate in the custody of Louisiana's Department of

Corrections, filed the instant Petition for writ of *habeas corpus* on July 8, 2013.  [doc. # 1, p.

16].[1]  Petitioner attacks his 2009 conviction for second degree murder and the life sentence

imposed by the Sixth Judicial District Court, Tensas Parish.  This matter has been referred to the

undersigned for review, report, and recommendation in accordance with the provisions of 28

U.S.C. § 636, Rule 10 of the Rules Governing Section 2254 Cases in the District Courts, and the

standing orders of the Court.  For the following reasons, it is recommended that the Petition be

**DENIED**.

### Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

---

[1] Petitioner presented his pleadings to the Louisiana State Penitentiary Legal Programs
Department for filing on July 8, 2013.  [doc. # 1, p. 16].  The Petition and exhibits were
mistakenly filed in the United States District Court for the Eastern District of Louisiana on July
9, 2013.  *See Davis v. Cain*, No. 2:13-cv-5044 (E.D. La.) Upon realizing the error, Petitioner
again presented his pleadings and exhibits to the Legal Programs Department and filed the
instant Petition in this Court on July 30, 2013.  *Id.* at 18.  Pursuant to the "mailbox rule," *Cooper
v. Brookshire*, 70 F.3d 377, 380 (5th Cir. 1995), the pleadings should be considered filed as of the
date they were initially presented to the Legal Programs Department for filing.

In January of 2007, the defendant told police that his wife, Annette Davis, had been missing for two days. Annette's vehicle was soon discovered after a plea for help was aired on the local news. Two months after her disappearance, her body was found in a shallow grave off Newell Ridge Road, northwest of Newellton. She died from blunt force trauma to her head.

*State v. Davis*, 47 So. 3d 1112, 1113 (La. App. 2 Cir. 2010).

A Tensas Parish grand jury indicted Petitioner on May 31, 2007, charging him with the offense of Second Degree Murder. [doc. # 14, p. 45]. On October 29, 2009, a jury found Petitioner guilty as charged. [doc. # 14-2, p. 66]. On December 2, 2009, Petitioner was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. [doc. # 14-5, p. 33].

Petitioner appealed to the Second Circuit Court of Appeal claiming primarily that the evidence was insufficient to support the verdict. *Davis*, 47 So. 3d at 1119. Petitioner also alleged seven other assignments of error, the first six of which being described by the appellate court as meritless "stream of consciousness" arguments. *Id.* at 1120. Specifically, Petitioner alleged: (1) [Petitioner] was prejudiced that the ADA's opening statement alleged this was a crime of passion, ignited by [Petitioner's] wife having an affair; (2) A misstatement concerning "Pete" Mizell's identification of him on the bridge and the Crime Stoppers call being undisclosed *Brady* material; (3) Alleged conflicts in the testimony of the state crime lab personnel and Sheriff Jones, about whether or not his fingerprints were on the envelope of the mysterious letters received by him; (4) None of the "sign" letters could be traced to his home; (5) The state tried to prove he was on a bridge on the Monday in question; and (6) The state disclosed a handwritten note to Sheriff Ricky Jones. *Id.* at 1120-21. The seventh claim ostensibly alleged ineffective assistance of counsel. *Id.* at 1121.

2

On September 22, 2010, the appellate court affirmed Petitioner's conviction.  *Id.*  The Louisiana Supreme Court denied Petitioner's application for writ of certiorari on February 25, 2011.  [doc. # 1-4, p. 2].  Petitioner did not seek further review in the United States Supreme Court.

Petitioner subsequently filed an application for post-conviction relief in the Sixth Judicial District Court.  [doc. # 14-6, p. 6].  The trial court denied the application on September 18, 2012.  *Id.* at 94.  The Second Circuit Court of Appeal denied Petitioner's writ application on January 10, 2013.  *Id.* at 98.  The Louisiana Supreme Court denied writs on June 21, 2013.  *Id.* at 100.

Petitioner filed the instant Petition on July 8, 2013, requesting relief for the aforementioned claims raised on direct appeal.  [doc. # 1-2, p. 7].

The matter is now before the undersigned.

## Law and Analysis

### I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims

### A. <u>Claim One: Insufficient Evidence</u>

In Petitioner's first claim, he contends that the circumstantial evidence adduced at trial was insufficient to prove the elements of the crime of second degree murder.  [doc. # 1-2, p. 7]. He states that "in order to convict a person based on circumstantial evidence the State must negate every reasonable hypothesis of innocence" and "[i]n this case that simply did not happen." *Id.* at 14.  Petitioner goes on to posit several alternative hypotheses as to how his wife could have been killed.  *Id.*

4

When a *habeas* petitioner asserts that the evidence presented to the trial court was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Va.*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

In the case at bar, the Louisiana appellate court invoked and applied the *Jackson* standard, and it did not do so unreasonably. *See Davis*, 47 So. 3d at 1119. To explain, second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. LA. REV. STAT. ANN. § 14:30.1(A)(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Graham*, 420 So. 2d 1126, 1127 (La. 1982). In addition to proving specific intent, the State is also required to prove that the defendant is the perpetrator. *State v. Draughn*, 950 So. 2d 583, 593 (La. 2007). Identity with regard to second degree murder can be proved by circumstantial evidence alone. *See*, *e.g.*, *State v. Blanks*, 86 So. 3d 56, 65 (La.

5

App. 2 Cir. 2012); *State v. Seals*, 83 So. 3d 285, 307 (La. App. 5 Cir. 2011); *State v. Knight*, 34 So. 3d 307, 315-16 (La. App. 5 Cir. 2010).  Further, when the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.  *State v. Bright*, 776 So. 2d 1134, 1147 (La. 2000).  Finally, as Petitioner correctly states, when circumstantial evidence is used to prove the commission of the offense, LA. REV. STAT. ANN. § 15:438 states that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."[2]

The state appellate court set forth the testimony and evidence presented at trial as follows:

1. Officer Clarence Hall of the Newellton Police Department testified that:

 • on Tuesday, January 16, 2007, around 7:30 p.m., Leroy Davis (Petitioner) flagged him down and told him that he needed to speak with the police chief;

• since the police chief was unavailable, Officer Hall had Davis come to the police station to speak with him;

• Davis mentioned something about needing another cell phone;

• after a brief conversation, the officer left to answer an alarm call;

• after completing that call, he was again flagged down by Davis, at which time they returned to the station and talked some more;

• Davis told the officer that his wife had been missing for a couple of days;

• the officer called Annette's cell phone, but no one answered;

---

[2] In caution, the Court notes that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal *habeas corpus* proceedings; only the *Jackson* standard need be satisfied here, even if state law would impose a more demanding standard of proof.  *See Foy v. Donnelly*, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

• he then called Annette's place of employment and was told that she was not there;

• he kept trying to call Annette's cell phone until after midnight, at which time he called the sheriff's office to advise that the lady was missing;

• Detective John Matthews came to the Newellton Police Department to speak with Davis; and

• he (Hall) spoke with Annette's son, who told him that Davis had been recording Annette's telephone conversations and that his mother had asked him to pass this information on to the sheriff's office.

2. Detective John Matthews of the Tensas Parish Sheriff's Office testified that:

• he first spoke with Davis early Wednesday morning, January 17, 2007, at the Newellton Police Department;

• Davis told him that he hadn't seen his wife since Sunday, January 14, when he left to take his daughter to college;

• Davis gave him a written statement detailing what he did on that Monday;

> Davis wrote that on Monday, he woke up around 6:30 a.m., went to work, left work around 3:00 or 3:30 p.m., went to Wal–Mart for about 30 minutes and then came home around 6:00 or 6:30 p.m., with his wife not being present at the house. Later he went to a lodge meeting, stopped at a bar afterwards, and returned home again around 10:00 p.m. During this statement, Davis never mentioned that his truck broke down or that his sister picked him up to bring him home. Detective Matthews testified that Davis also never mentioned that he drove his wife's vehicle, or was near Newell Ridge Road, on that date.

• Davis then gave a statement detailing what he did on that Tuesday;

> Davis wrote that on Tuesday, January 16, he got up and arrived at work at around 8:00 a.m. He stayed for a short period of time and then left somewhere between 9:00 or 9:30 a.m. to go to the Tower Loan in St. Joseph to complete a loan application. He then went to Tensas State Bank in Newellton to make a deposit. He got gas and activated a cell phone in Shreveport. He then left Shreveport and called Verizon in reference to his early report that his cell phone was missing. He then drove to Monroe, where he had a daughter (or two daughters) who went to college, gave them each $20.00, and drove

home. He revealed nothing at this point about his truck breaking down at the intersection of Highway 888 and 575. Davis told Matthews that he had contacted the hospital where his wife worked on Tuesday evening to see if she had come in for her shift. He also told Matthews that he called his wife's friend, Emma Bass, who told him that she had seen Annette driving her car on Monday night on her way to work. Ms. Bass later denied telling Davis that she saw Annette on that Monday evening.

• at this point, Davis conveyed to Detective Matthews his fear that someone had kidnapped his wife on her way to work;

• he (Matthews) reported his findings to Sheriff Ricky Jones early the next morning, whereupon the two made several phone calls to the hospital where Annette worked and also contacted the news media with a request for the public's assistance in finding Annette or her car;

• the television station's story led to the discovery of the vehicle in Madison Parish;

• he interviewed Davis's sister, Jackie Sardinas, who said that he had contacted her Monday, asking to be picked up from a truck stop in Tallulah;

• the next morning, she admitted lying the day before about picking up her brother from a truck stop, admitted that he had actually called her a few days earlier and had her drive out to Highway 603, telling her that if his truck ever broke down, he would need her to pick him up right there;

This location turned out to be about two-tenths of a mile south of where Annette's vehicle was later discovered.

• she then told Matthews that she actually picked up Davis about a quarter of a mile north of that area on that Monday;

• Ms. Sardinas took him to the exact location where she had picked him up;

• using photographs, Matthews showed the jury the area in question, pointing out the close proximity to where Annette's vehicle was found;

• Matthews never asked Davis if his car had broken down in that area; and

• He had never heard about a farmer jump-starting the defendant's truck.

3. Tensas Parish Sheriff Ricky Jones testified that:

8

• he became involved in the case after a Newellton police officer contacted him;

• as soon as he read defendant's first statement he knew that Davis was guilty;

• the tipoff was the attempt to set up such an elaborate alibi;

• he contacted a local news station and gave them a picture of Annette and a detailed description of her car, in an appeal to the public for help;

• because of the media's help, the car was located in Madison Parish;

• he went to the scene, finding a pair of white Crocs shoes in the car;

• the car, registered in Annette's name, had a flat tire;

• Louisiana State Police became involved, with Trooper Harwell as lead investigator;

• Davis told officers that they would receive a "sign of his innocence";

• a letter addressed to Jones was received a short while later by Harwell;

• the letter said Annette was okay because, "God takes care of his own";

• the mailing contained a cell phone;

• Davis gave verbal consent for the police to search his home;

• Harwell found a drop of blood on a shoe in the hallway;

• a search warrant was secured, the execution of which revealed blood splatters on the walls and carpeting in the hallway, on picture frames, on a bookshelf, with most of the blood found on the carpeting;

• Davis admitted recently purchasing carpet runners in the hallway;

• State Police Crime Lab personnel cut a piece of the carpeting for testing, which showed that the blood had soaked through the carpeting and padding, leaving a stain on the concrete foundation of the floor;

• Davis said that he did not know what was splattered on the wall;

• Davis was interviewed several more times;

9

• the police received another letter, triggering another search of the Davis home for the typewriter or printer that generated the correspondence;

• no physical evidence was found to link Davis to the letters, and the only print discovered was that of Sheriff Jones;

• when asked by Davis whether they had received any signs, the officers responded in the negative;

• within a few weeks, three anonymous letters were received by the officers;

• the third letter in regard to Annette (referred to therein by her first name, Melanie) stated that she was doing well, was sorry for what she had done, but that she wanted to start a new life, requesting that her family stop wondering about her whereabouts, as she did not want to be found;

• a Crime Stoppers caller from Ouachita Parish claimed to have discovered a grave at the intersection of Highways 888 and 575;

• he (Jones), Matthews, and Chief Deputy Rushing went to the site, noting that the corners of the grave were marked by bricks, and a pipe with artificial flowers was stuck into the ground;

• the pipe and flowers were located above the body's head, leading him (Jones) to reason that whoever left them knew how the body was arranged;

• he contacted the State Police Crime Lab, who in turn contacted Mary Manhein, a nationally known expert in forensic anthropology;

• in court, he identified the gravesite on a map, locating it just west of Newellton, off Highway 888, down a turn row, next to a cemetery;

• he stayed while the female body, wrapped in plastic and tied with rope, was excavated from the grave;

• the body was in a River Region shirt, with a necklace inscribed with an "A";

• the body had a black garbage bag on her head;

• the autopsy reported the cause of death to be blunt force trauma to the head;

• Ms. Manhein identified the body as Melanie Annette Davis;

10

• Davis was arrested the day after the body was found and identified;

• an inmate, Craytonia Badger, later wrote him (Jones) about a conversation he had with Davis in jail, during which Davis admitted attempting to murder his wife on three separate occasions, the first two being unsuccessful;

> Davis told Craytonia Badger that he had picked up two barrels and some cement and intended to incapacitate his wife, put her in the barrels with cement, and throw her into the Mississippi River. He said the plan failed because as he was trying to beat his wife unconscious, his daughter walked in. The second attempt involved rat poison in her food, but she didn't eat supper that evening. He finally killed her by hitting her with something. He buried her in a shallow grave.

• Badger's credibility was enhanced by his coming forward with information not known to the general public—that the defendant had AIDS;

• Davis told Badger of his wife's unfaithfulness;

• he (Davis) also told Badger that digging the grave took several days;

• Juanita "Pete" Mizell thought she saw Davis driving his wife's car on the Monday in question, January 15, 2007, on a bridge on Highway 888, near where Annette's body was later discovered;

• he (Jones) admitted that no other suspects were developed;

• there was neither DNA nor any fingerprints linking Davis with the letters;

• the only circumstantial evidence linking the letters to Davis was that Davis had told police they would receive a sign that he was innocent;

• he had never arrested the defendant before, and he was unaware of any domestic problems between Davis and Annette;

• Davis cooperated with police by giving voluntary statements, and by giving verbal consent for the search of his home;

• no weapon was ever recovered at the defendant's home, and no physical evidence linked Davis to the crime, other than her blood being at his home;

> Later testimony of crime lab personnel showed additionally that DNA of both defendant and victim were mixed in two locations in her car:

the steering wheel cover and a portion of the left rear carpet in the trunk.

• the last person to know that Annette was alive was her son, who spoke to her on the phone in the late afternoon on the Monday in question;

• Ms. Sardinas and Davis both placed him at home on Monday at 6:30 p.m.;

• he was at a lodge meeting sometime around 7:00 or 7:30 p.m.;

• Davis went to a bar afterwards;

• on Tuesday, Davis went to work, then drove around north Louisiana, visiting a loan company, a bank, a gasoline station, and a man about Jeep repairs;

• no physical evidence tied Davis to the gravesite; no fingerprints, no shoe prints, and no DNA evidence.

• concerning Badger's information, he (Jones) never confirmed with prison officials that Badger and Davis had any contact, nor did he confirm whether or not Davis had perpetrated domestic violence on Annette in the past;

• Badger received no benefit for supplying the information on Davis;

• no neighbors saw the defendant load anything into a car;

• he did not know whether police had checked phone records to see if Davis had tried to call his wife during this time frame;

• a person was indeed arrested for the theft of Davis's cell phone;

• it was very possible that Davis did not leave fingerprints because he was wearing gloves, and his DNA would have been all over the crime scene anyway, as it was his own home;

• since the gravesite was outdoors, any DNA could have washed away;

• no evidence was ever found that any other suspect was ever in the home of the defendant and Annette, during this time frame;

• if there had been domestic abuse between Davis and Annette, it was quite possible that no one else knew, not even family members;

12

• Annette was having an affair with a man named Richard Dunmore, who had solid alibis for his whereabouts during the critical couple of days; and

• the conversations with Davis about "signs of innocence" was during the same relatively short time frame during which the letters came.

4. Investigator Rob Rushing of the Tensas Parish Sheriff's Office testified that he was present when the defendant made a statement on January 17, 2007, though Officer Harwell was the officer who actually took the statement. Rushing authenticated the videotape of this statement, which was taken on Wednesday, the day after Annette was reported missing. The tape was then played in open court.

Officer Rushing testified that at the time the statement was recorded, the case concerned a missing person. He stated that the Louisiana State Police were not called in until Annette's abandoned car was found; however, his office continued to assist in the investigation.

He testified that he found some of the information Davis told him to be true, and some false. The defendant admitted to having extramarital affairs and told police that his wife did as well. It appeared from the information given to police by Davis that Annette had infected him with HIV, but during their investigation, police discovered that Davis got sick first. Davis told him he went to a lodge meeting on Monday in his 1998 Oldsmobile, which was later confirmed. Davis also said in his statement that he never argued with his wife, which fact was discredited during the police investigation that revealed that the two argued quite often.

Police also discovered that Davis did not travel through Delhi and go to a truck stop in Tallulah, although he had said this in his statement. Davis also said during his statement that when his sister dropped him off that evening at home, neither Annette nor her vehicle was there; however, witnesses (Richard Dunmore, Demarco Dunmore, and Jackie Sardinas) stated that Annette's vehicle was there that evening. Jackie Sardinas stated that her car was there when she dropped her brother off. Richard Dunmore said he saw Ms. Sardinas drop Davis off and noticed that Annette's car was at home.

5. Deputy Jack McMillan of the Tensas Parish Sheriff's Office interviewed Emma Bass as part of his investigation. He stated that Ms. Bass was a friend and coworker of Annette's. Ms. Bass told Deputy McMillan that she had received a phone call from the defendant wherein he told her his whereabouts on Tuesday. Ms. Bass thought it was strange that he called because they weren't close. In fact, at one time, he had accused her of knowing that Annette was having an affair.

Deputy McMillan also interviewed a person by the name of Craig Jones on January

13

19, 2007.  Jones told McMillan that he had seen Davis's truck parked on Highway 575 on Tuesday morning around 11:00 a.m., and that a shovel was in the bed of the truck. By evening, the vehicle was gone. Deputy McMillan, who is familiar with the area, stated that the area where Jones told him he saw Davis's truck was approximately 200 yards from where Annette's body was found.

Deputy McMillan also interviewed Juanita Mizell. She told him that she lived on Newell Ridge Road (Highway 888). She stated that on Monday, January 15, 2007, sometime around dusk, while she was making a turn onto Highway 575 from Highway 888, she noticed a vehicle parked on Highway 888, parked on a bridge. The vehicle didn't have its lights on and the trunk was open. A person dressed in camouflage was standing on the rail of the bridge. The person turned and waved at her and she recognized the person to be the defendant. She stated that she knew Davis because she went to school with him. She estimated that she saw Davis around 6:00 or 7:00 p.m. Mizell said the car was a silver car, and that it was the same model of car that a Chelsea Carden (an acquaintance of Mizell's) drove. Deputy McMillan located Carden's vehicle and confirmed that it was the same make and model as Annette's vehicle. Deputy McMillan testified that the bridge is approximately one to two football fields from the gravesite where the police found Annette's body.

On cross-examination, Deputy McMillan admitted in the notes he took during Mizell's interview on February 1, 2007, he had not written that Mizell identified the man on the bridge as Davis.

*Davis*, 47 So. 3d at 1113-1119.

Upon considering Petitioner's insufficient evidence argument, as well as the abundance of circumstantial evidence admitted at trial, the Louisiana appellate court concluded:

The circumstantial evidence is overwhelming, and the verdict is amply supported by this record. Consider:

> • how unlikely it would be for a person to live in a home for days and not notice the sight and smell of a blood-soaked hallway;
> • how the timing of [Petitioner's] purchase of the runner for the hall appears especially devious;
> • how [Petitioner's] predictions of exonerating "signs," closely followed by three self-serving letters, are about as phony as it gets;
> • how his frenetic efforts at establishing successive contradictory alibis worked against him;
> • how bragging to another inmate could produce nuggets of information known only to the killer;

14

> • how [Petitioner's] actions early on were anything but those of a
> concerned husband of a missing wife;
> • how his story that Annette's car was gone Monday night was denied
> by his own sister and Richard Dunmore;
> • how unexplainable it looks for the DNA of [Petitioner] and his wife
> to be mixed together at two places in Annette's car;
> • how Juanita "Pete" Mizell identified [Petitioner] with Annette's car,
> as he was dumping something off the bridge located between the
> gravesite and his home (denied by [Petitioner]); and
> • how Annette's car was found only 200 yards from where he had left
> his truck.

*Id.* at 1115-16.  Overall, the Louisiana appellate court, applying the *Jackson* standard,
found that the evidence was sufficient and that Petitioner's claim was without merit.  *Id.*  The
undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable
in this regard; therefore, it is recommended that Petitioner's claim based on insufficiency of the
evidence be **DENIED**.

B. Claim Two: Ineffective Assistance of Counsel

Petitioner first argues that the "lower court failed to review Petitioner's claim of denial of
effective assistance of counsel."  [doc. # 1-2, p. 15].  Next, Petitioner argues that the trial court
improperly denied him an evidentiary hearing that he needed to prove his ineffective assistance
claim.  *Id.*  Petitioner also alleges that his trial counsel was ineffective for failing to: (1) subject
the prosecution's case to any meaningful adversarial testing; (2) properly prepare for trial; (3)
render meaningful investigation; (4) investigate; (5) present a valid alibi defense; (6) render
crucial cross examination; and (6) introduce crucial evidence for consideration.  *Id.* at 15-16.
Finally, Petitioner demands an evidentiary hearing to support these allegations.  *Id.* at 15.

i. Lower Court Review of Petitioner's Ineffective Assistance of Counsel Claim

Petitioner states, without explanation, that the lower court failed to review his claim of

15

ineffective assistance of counsel. *Id.* Petitioner's claim is groundless because the state appellate court (on direct review) and the trial court (on collateral review) did, in fact, consider Petitioner's claim. [*See* doc. # 1-3, p. 55; # 14-6, p. 93].

     ii. <u>Trial Court's Denial of Evidentiary Hearing</u>

Petitioner claims that the state *habeas corpus* court improperly denied his request for an evidentiary hearing. Infirmities in state *habeas corpus* proceedings do not state a claim for federal *habeas corpus* relief. *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984); *see Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999). Accordingly, this claim is not cognizable under federal *habeas corpus* review.

     iii. <u>Ineffective Assistance of Counsel</u>

Although Petitioner lists six permutations of ineffective assistance of counsel, a closer reading of Petitioner's Memorandum, [doc. # 1-2], reveals that Petitioner is actually alleging only the following: (1) that trial counsel failed to subject the prosecution's case to meaningful adversarial testing by failing to effectively cross-examine the State's witnesses; (2) that counsel did not call twenty-five witnesses that Petitioner wanted to testify; (3) that counsel failed to present an alibi defense; and (4) that counsel failed to object or prevent the prosecutor from badgering Petitioner and failed to prevent Petitioner from incriminating himself. [*See* doc. # 1-2, p. 16, 20, 30, 31].

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254. *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012). Substandard advice of counsel rises to a constitutional violation only if it deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right. *Strickland v. Wash.*, 466 U.S. 668,

686-87 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show

that his counsel's actions fell below an objective standard of reasonableness and that the

ineffectiveness of counsel prejudiced him.  *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other

prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs

of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162,

172 n.6 (5th Cir. 1997).  Furthermore, "mere conclusory allegations in support of a claim of

ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v.*

*Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's

actions are encompassed within the wide range of reasonable competence and fall under the

ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The petitioner must show that the

performance of counsel fell "outside the wide range of professionally competent assistance."  *Id.*

at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that counsel's

actions "were so serious as to render the proceedings unreliable and fundamentally unfair."  *U.S.*

*v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir.

1984).  Unreliability and unfairness do not result "if the ineffectiveness of counsel does not

deprive the defendant of any substantive or procedural right to which the law entitles him."

*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5th

Cir. 1995).  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim,

*Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995), and prejudice generally exists only if the

petitioner demonstrates that he would have received less jail time.  *U.S. v. Grammas*, 376 F.3d

433, 436 (5th Cir. 2004).

a. Failure to Cross-Examine Witnesses

Petitioner, in substance, argues that trial counsel failed to cross-examine–or failed to

adequately cross-examine–several of the State's witnesses including: (1) Officer Clarence Hall;

(2) Detective John Matthews; (3) Sheriff Ricky Jones; and (4) Richard Dunmore.  [doc. # 1-2,

pp. 21, 23, 25, 29].  More specifically, Petitioner argues that trial counsel failed to cross-examine

several of the aforementioned witnesses about certain events, failed to ask specific questions that

Petitioner wanted him to ask, and failed to press certain issues and strategies when questioning

the witnesses.  *Id.*

Many of Petitioner's assertions claiming ineffective assistance of counsel involve trial

tactics.  Debatable trial tactics and strategies do not constitute a denial of effective assistance of

counsel.  Petitioner fails to show that his attorney's decisions not to ask specific questions or

pursue certain defense strategies when questioning the witnesses were not part of a reasonable

trial strategy.  As the Supreme Court explained in *Strickland*: "Judicial scrutiny of counsel's

performance must be highly deferential.  It is all too tempting for a defendant to second-guess

counsel's assistance after conviction or adverse sentence, and it is all too easy for a court,

examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.  Further, a defense

counsel's trial strategy, which includes his asking or refraining from asking certain questions of

witnesses, does not reach constitutional proportions.  *See, e.g.*, *Lovett v. Fla.*, 627 F.2d 706 (5th

Cir. 1980); *U.S. v. Johnson*, 615 F.2d 1125, 1127 (5th Cir. 1980).  Here, Petitioner fails to

establish the deficiency prong of *Strickland*, especially when counsel did cross-examine the witnesses.  [*See* doc. # 14-3, p. 142, 159, 191; doc. # 14-4, p. 38].

### b. Failure to Call Specific Witnesses

Petitioner avers that trial counsel failed to call any of the twenty-five (25) witnesses that Petitioner wanted to call.  [doc. # 1-2, p. 20, 31].  According to Petitioner, his counsel told him that all of the witnesses had been contacted and would be at court during trial.  *Id.* at 20.

Once again, Petitioner is quibbling with counsel's strategic choices.  Claims of uncalled witnesses are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of the content of a prospective witness's testimony are largely speculative.  *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).  "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a *habeas* court cannot even begin to apply *Strickland*'s standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance."  *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Here, counsel was not ineffective for failing to call all of the witnesses because the prosecution called nine of the witnesses listed on the twenty-five witness roster that Petitioner provided counsel.  [*See* doc. # 14-3, p. 135-245; doc. # 14-4, p. 1-203].  Petitioner's counsel cross-examined eight of those witnesses.  *Id.*  As to the witnesses that were not called, Petitioner must show not only that the witnesses' testimony would have been favorable, but also that the witnesses would have, in fact, testified at trial.  *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).  Petitioner has shown neither.

He has presented no affidavits from his proposed witnesses setting forth their testimony and willingness to testify and he has not shown that the testimony would have, in fact, been admissible and favorable.

> c. <u>Failure to Present an Alibi Defense</u>

Petitioner claims that trial counsel was ineffective for failing to consider his proffered alibi defense.  [doc. # 1-2, p. 29].  Petitioner does not elaborate on what exactly counsel failed to do.  For instance, Petitioner does not state whether counsel failed to subpoena alibi witnesses or failed to find alibi witnesses.  Nor does he state what alibi witnesses might have been available and willing to testify.

Petitioner has failed to establish that any evidence existed on which a viable alibi defense could have been based.  Petitioner has failed to identify the alleged alibi witnesses his counsel should have subpoenaed or found and he has neither provided evidence that the witnesses would have testified in a manner favorable to him nor described the substance of what their testimony would have been.  Without such evidence, there is no basis for finding that counsel wrongly rejected any viable alibi defense.  *See Sayre*, 238 F.3d at 636 ("A prisoner's bald conclusory assertion that supposed alibi witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable.").  In sum, Petitioner has not established that he was prejudiced by his counsel's failure to pursue such a defense.

> d. <u>Failure to Object or Prevent the Prosecutor From Badgering Petitioner and</u>
> <u>Failure to Prevent Petitioner From Incriminating Himself</u>

Petitioner claims that trial counsel was ineffective for failing to prevent the prosecutor from harassing Petitioner and for failing to prevent Petitioner from incriminating himself during the prosecution's cross-examination.

To begin with, the Court notes that trial counsel did object after the prosecution interrupted Petitioner's testimony.  [doc. # 14-4, p. 236].  After the prosecution interrupted Petitioner mid-sentence, counsel objected stating, "Your Honor, let him answer the question." *Id.* Thus, any claim that Petitioner has with regard to the line of questioning that prompted that objection must fail.

With regard to any other alleged harassing line of questioning, Petitioner does not demonstrate that any objection would have been successful.  Petitioner only makes a broad claim that counsel did not adequately object to the prosecution's examination; Petitioner does not point to any particular questions that would have merited such an objection.  It is not this Court's obligation to scour the record in search of evidence that might support such a conclusory claim. *Gleason v. Warden*, 2010 WL 2777272, at *6 (W.D. La. May 10, 2010).  In other words, Petitioner has not provided the Court with any starting point to analyze whether any objection would have had merit, or demonstrated that counsel's performance was deficient in this area.

Petitioner has also failed to demonstrate that counsel was ineffective for failing to prevent Petitioner from incriminating himself during the prosecution's cross-examination.  Petitioner does not elaborate on this claim and does not identify what objection trial counsel should have made or when counsel should have made it.  Again, it is not this Court's obligation to comb through the record in search of a particular question or line of questioning that might have been objectionable.

21

In any event, it was Petitioner who insisted on testifying despite knowing that he would be subject to cross-examination and despite trial counsel's advice not to testify.  [doc. # 14-4, p. 97].   The trial court specifically asked Petitioner:  "Do you also understand that if you do testify, if you take the stand, that you are subject to cross-examination?"  *Id.* at 98.  Petitioner answered in the affirmative.  *Id.*  Trial counsel then informed Petitioner that the prosecutor was a "very good attorney and . . . would crucify you on cross-examination."  *Id.*  Petitioner acknowledged counsel's admonition and stated, "I would like to say that I would like to speak on my own behalf . . . ."  *Id.* at 99.   The trial court again asked Petitioner:  "But you understand after you speak on your own behalf, that [the prosecution] can cross-examine you?"  *Id.*  Petitioner answered in the affirmative.  *Id.*  Finally, trial counsel asked Petitioner to once more affirm that he did not advise Petitioner to take the stand.  *Id.* at 103.  Petitioner affirmed.  *Id.*  Taking the colloquy between the trial court, trial counsel, and Petitioner into consideration, it is clear that Petitioner's decision to testify was inexorable, and that trial counsel's actions were well within the range of competence demanded of an attorney in a criminal case.

iv. Evidentiary Hearing

Finally, Petitioner demands an evidentiary hearing to support his allegations of ineffective assistance.  [doc. # 1-2, p. 15].   As discussed by the Supreme Court in *Cullen*, 131 S.Ct. at 1400-01, the decision to hold an evidentiary hearing is a statutorily mandated determination limited by the provisions of § 2254(e)(2).  A court "shall not hold an evidentiary hearing on the claim unless the applicant shows that the claim relies on a new rule of constitutional law . . . or a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing

22

evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.  28 U.S.C.A. § 2254(e)(2).

Here, there is no basis for granting an evidentiary hearing.  Petitioner does not base his claim on a new rule of constitutional law.  Nor does Petitioner's claim of ineffective assistance rely on a factual predicate that could not have been previously discovered through the exercise of due diligence.  Petitioner does not state what evidence an evidentiary hearing will uncover or even how any evidence that a hearing might produce would bolster his claim.  Thus, the record before the Court is sufficient to resolve Petitioner's claim.

Petitioner has failed to demonstrate that he received ineffective assistance of counsel. Accordingly, it is recommended that this claim for *habeas* relief be **DENIED**.

C. Remaining Assignments of Error

Petitioner puts forth these remaining assignments of error: (1) [Petitioner] was prejudiced that the ADA's opening statement alleged this was a crime of passion, ignited by [Petitioner's] wife having an affair; (2) A misstatement concerning "Pete" Mizell's identification of him on the bridge and the Crime Stoppers call being undisclosed *Brady* material; (3) Alleged conflicts in the testimony of the state crime lab personnel and Sheriff Jones, about whether or not his fingerprints were on the envelope of the mysterious letters received by him; (4) None of the "sign" letters could be traced to his home; (5) The state tried to prove he was on a bridge on the Monday in question; and (6) The state disclosed a handwritten note to Sheriff Ricky Jones.  [doc. # 1-2, p. 7].  Petitioner does not brief or explain any of these claims.

The state appellate court declined to discuss Petitioner's arguments.  The appellate court stated: "Davis lists seven assignments, the first six being primarily in the nature of argument, or

stream of consciousness. There is really nothing to discuss." *Davis*, 47 So. 3d at 1120. So too here the Court declines to consider Petitioner's unexplained claims. Petitioner's bare allegations do not show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law or that the adjudication of his claims resulted in a decision that was based on an unreasonable determination of the facts. Accordingly, it is recommended that these claims be **DENIED**.

<u>**CONCLUSION**</u>

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Leroy Davis [doc. # 1] be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 4th day of December, 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE